## GUBBINS v. LAUTENSCHLAGER et al.

(Circuit Court, S. D. Iowa, E. D.    March 2, 1896.)

1. CONTRACTS—ACCEPTANCE OF WORK.

Plaintiff made a contract with defendants, in the form of a proposal and acceptance, referring to certain plans and specifications, for the erection of a slaughtering and packing house, with machinery. The contract provided, in reference to manner of performance, that plaintiff covenanted "to furnish and perform in a complete manner, and in accordance with the specifications, * * * and to the entire satisfaction of H. & S., superintendents, * * * the entire," etc. The specifications provided that plaintiff should be held strictly to execute the work, use the materials described, submit, as to the character of material and work, to the judgment of the superintendents, and replace any material not, in their judgment, in accordance with the specifications; and that, after notice in writing to plaintiff of defects, the defendants might remedy them at his expense, if he neglected to do so. The contract also provided that the final payment should not be made to plaintiff, except on condition of his giving a bond to protect defendants from loss by defects in the machinery. Held, that it was not necessary for plaintiff, in an action on the contract, to show a written acceptance of the work by the superintendents.

2. SAME—CONDITION PRECEDENT.

Held, further, that it was not necessary to prove acceptance by the superintendents of the work done and materials furnished, as a condition precedent to a recovery on the contract.

3. SAME—PERFORMANCE.

It appeared as a fact that the specifications to which reference was made in the contract called for the furnishing, as the refrigerating machine of the plant, of a particular, secondhand machine, which defendants had themselves selected. Held, that an objection to the performance of plaintiff's contract, resting upon the failure of the machine, so selected by defendants, to do work required of it, was not sufficient to defeat plaintiff's recovery.

4. SAME—NOTICE OF DEFECTS.

Held, further, that notices, given by the superintendents to plaintiff, that certain parts of the machinery were "worthless and dangerous, not fit for use, liable to cause damage, their construction in direct violation of the contract," without other specification of the nature of the alleged defects, were insufficient as notices to require plaintiff to replace such parts of the machinery, or to defeat his right to recover therefor.

5. SAME—COMPLETION.

Held, further, that plaintiff could not recover for labor or materials expended in trying to bring the plant to a satisfactory condition, even though so expended after a time when plaintiff would have been justified in treating his contract as performed, and leaving the work.

6. SAME—TIME.

Held, further, that, in the absence of anything to show that time had been made of the essence of the contract, defendants could not recover upon a counterclaim, in the action on the contract, for expenses and losses arising from plaintiff not completing the contract at a date at which he had said he would try to complete it.

7. SAME—WAIVER OF DEFENSES.

Held, further, that defendants, by failing to set up in their answer that plaintiff had failed to show that there were no claims for labor or materials which might be liens on the plant, and to furnish a bond to protect defendants from loss, had waived the requirements that such proof and security should be given, as a condition of making the final payment, and were not entitled to insist on this defense upon the argument of the cause.

James H. Anderson and A. B. Jenks, for plaintiff.
Clark Varnum and Jas. C. Davis, for defendants.

WOOLSON, District Judge. Plaintiff claims judgment against the defendants for $16,284.96, with interest, on account of work and materials, under contract with defendants, in the erection of certain machinery, etc., in a slaughtering and packing house at Ft. Madison, Lee county, Iowa, and the foreclosure of mechanic's lien therefor, filed by him against said property. Defendants admit the execution by them, with plaintiff, of a contract for the work, machinery, etc., but claim judgment against plaintiff for failure to furnish same in accordance with the contract, in that plaintiff failed to complete the same within the time provided in contract, failed to furnish the machinery, etc., of the quality and capacity therein required, and for damages suffered in loss of time and property, and expense occasioned thereby. The contested facts are many. Scarcely an important fact material to the case is undisputed. In no case with which I have ever been connected, during my experience with courts, has the testimony been in more direct and incessant conflict. A large amount, extending into the thousands of pages, of evidence and exhibits, has been submitted. No practical benefit would result if the attempt were made to state with any largeness of detail the evidence on which the facts found are decided. The duties pressing upon me compel the statement of the facts found, without attempting detailed reference to the witnesses whose testimony leads me to the conclusions reached.

In December, 1891, plaintiff and the defendants entered into a preliminary contract for the furnishing by plaintiff of refrigerating and other machinery for a slaughtering and packing house about to be built by defendants at Ft. Madison, Iowa. This contract was preliminary, in that it did not specify the terms of payment, nor did it name the superintendent under whom the work was to be done. But it did provide for the gross amount to be paid to plaintiff, and was made with specifications for work and materials before the contracting parties. This preliminary contract took the form of a proposal by plaintiff, and acceptance by defendants, to do the work and furnish the materials named in the specifications, and the written acceptance by defendants of such proposal. On the 7th of January, following, the parties entered more formally into contract for the same work and material, under the same specifications, the payment of the same sum, and that the work was to be performed "to the entire satisfaction of Huchl & Schmidt, superintendents in the premises." This contract also provided for the dates and conditions of the payment of the contract price of $25,083.50. The specifications are lengthy, and cover many points. At the very threshold of their consideration arises a contest as to which are the specifications which define the work, etc. Plaintiff presents what he claims are the specifications received and retained by him when he made his December proposal, and the ones under which he made such proposals, which defendants then accepted; while defendants present specifications which they claim are the specifications received by them when,

in December, they accepted said proposal made by plaintiff. It becomes essential to determine which are the correct specifications, since upon this point depends much of the sharp contest so forcibly urged in this suit.

The evidence shows that one Metzger, a resident of Chicago, and whose business was that of planning, etc., refrigerating machinery, came into consultation with defendant Lautenschlager with reference to the plant which defendant was about to erect at the city of Ft. Madison, Iowa. The citizens of the latter city proposed a bonus of $50,000 for the plant. Said defendant was desirous of building and equipping this plant as nearly as possible within this bonus. There is no substantial question but that the buildings would cost, if of the dimensions proposed, about $31,000. The machinery, outside of the ice or refrigerating machine, would cost about $15,000 to $18,000. The difficulty was as to the refrigerating machine. Metzger had knowledge of such a machine at Tampa, Fla. (a No. 4 double Linde machine), which could be bought at a greatly reduced price as compared with a new machine. He informed Lautenschlager of this fact, and that it could be bought for some $7,000. Lautenschlager found that, if he could get the refrigerating machine at that price, he could bring the cost of the plant much nearer the $50,000 bonus, than in any other way then apparent. He therefore directed Metzger to order the machine shipped to Chicago. But the Florida parties refused to ship it unless the money was paid before loading. Defendant found that he was not able to raise the money required, and Metzger thereupon proposed to defendant that, if Gubbins could obtain the contract for the rest of the work, he (Gubbins) might be induced to advance the money for the machine. This brought Gubbins and Lautenschlager together. Metzger drew up, at defendant's request, specifications for the contract work, including the refrigerating machine. The evidence shows that plaintiff was to receive $500 for refitting the machine, and putting it in order. At this December meeting, Gubbins presented his figures, for the entire machinery work, counting this Florida machine at $7,000, and its refitting at $500. The figures for the other work were deemed by defendant too large, and there was a revision of the specifications, the rejection of some articles therein, and the changing of others to a lower quality and price, until finally the price was agreed upon, the written proposal formally made by plaintiff, and formally accepted by defendant.

On page 5 of specifications presented by plaintiff, after the typewritten matter relating to brine piping (which follows the general specifications with reference to the refrigerating machine and its belongings), there is written, with pen and ink:

It is understood that this part of this specification shall be the double number 4 Linde machine Wolf sold in Tampa, Fla., complete except the ice-making part and brine piping.

The specifications presented by defendants do not contain any such pen-written addition; and the testimony of witnesses produced on the one side is squarely contradictory to that produced on the other, as to whether this pen-written portion was originally part of the

specifications (with reference to which the December proposal and acceptance were made), or has been since added. The evidence justifies the conclusion that Lautenschlager (who was, in the matters preliminary to the erection of this plant, the active defendant) was desirous of keeping from the people of Ft. Madison all knowledge of the fact that the refrigerating machine was a secondhand machine; and this assists in explaining why the specifications, with reference to such machine, were drawn as they were. The intent appears (and of this plaintiff had knowledge) that the specifications were to be so drawn as to induce bidders (who did not know of the Florida machine) to make high bids, so that these might be brought to the notice of the Ft. Madison people; while Gubbins, knowing of this Tampa machine and the intent to use it, might make his bid accordingly low. In the specifications it is provided (typewritten):

Refrigerating machine or machines, capable of receiving, compressing, and discharging two hundred thousand cubic inches of ammonia gas, at a tension of 5 pounds per square inch, at normal speed.

And again, under head of "Brine-Piping," it is declared (typewritten):.

"Piping is to be of 6" diameter spiral riveted of No. 18 galvanized wire, and suspended to ceiling of storage room, with neat wrought-iron hangers, and of sufficient quantity to produce and maintain a temperature of 36 Fahr., with the work of taking care of the meat going on in the rooms. The maximum number of hogs to be chilled is 800, of average weight of 200 lbs., and 200 beeves, of average weight of 600 lbs., per 24 hours.

The two sets of specifications presented are largely identical. In plaintiff's set appear erasures by pencil in many places, concerning which plaintiff testifies that the erasures were made as the December consultation progressed, in the effort to lower yet further the amount he had originally fixed as his contract price. In some parts of both there are additions or interlineations or changes, with pen and ink, common to both, which the testimony shows Metzger made at such consultation. Defendants' set of specifications is a carbon copy (the typewritten portion) of those presented by plaintiff, except page 5, and two subsequent pages (9 and 16), one of which (9) is the original whose carbon copy is in plaintiff's set. None of the disputed testimony relates specially to page 9 or 16. How or why page 5 of defendants' specifications is an original page, instead of a carbon copy (as are the other pages, except the two above named), is not shown. No satisfactory reason is attempted for the absence of the carbon copy in page 5 in defendants' set. The carbon copy is not accounted for. The evidence shows that a carbon copy was made of that page. The whole evidence is strongly convincing that, in the calculations between plaintiff and Lautenschlager as to a refrigerating machine, the Tampa machine was in mind. The evidence excludes all idea that a new machine, or anything approximating that described in the specifications, could have been procured for $7,500, the price at which the refrigerating machine was actually calculated by all parties at this December consultation. This pen-written addition to page 5 of plaintiff's set accords with the general evidence, for there is no good reason to doubt but that all parties had this

Florida machine in mind at the time. After the machine was at plaintiff's shop in Chicago, defendant Lautenschlager saw it there often; and the testimony is to the effect that he gave directions as to how it was to be painted and outwardly prepared, so as to conceal its secondhand appearance.

In comparing the two sets of specifications, we find in both sets many pencil erasures and interlineations in common; and there are also strong indications that in the specifications produced by defendants, in a number of places, pencil marks which had been drawn through (and erasing) parts of the typewritten words have been erased or rubbed out. How and when these pencil marks (erasing marks) were rubbed out or themselves erased from defendants' specifications does not appear. I may add here that, at the time when the contract of January 7th was signed, no specifications were then attached to this contract, although the contract in terms refers to specifications as attached thereto. There is no claim that the specifications were ever changed by mutual consent after the December meeting above referred to. The evidence shows (and on page 4 of defendants' set appear the words "have 3 copies") that it was agreed at the December meeting (on the 12th), and after the specifications had been revised, and prices cut down, and plaintiff's proposal had been accepted, that three copies should be made of the specifications as they then appeared, from the copy retained by the architects; one of these to be given to plaintiff, one to defendants, and the other to the architects (afterwards named as superintendents). After his proposal had been made and accepted, when plaintiff left the meeting, he took with him the copy of specifications on which he had made his changes, and the duplicate (carbon copy) was left with the architects, who were to make therefrom the triplicates above stated. Both plaintiff and Metzger testify that as the specifications were in process of revision, at the December meeting, the architects having one copy, and plaintiff another, as any change was made, plaintiff, in his copy, and the architects, in their copy, made the proper changes (erasures or interlineations) in their respective copies, as was then supposed. Plaintiff testifies that the set produced by him when giving his testimony is the set (and that it is in the same condition as to erasures and interlineations) which he took from the December consultation, and on which he made his proposal. The general circumstances in evidence as to this December meeting corroborate these statements as to what was there done. The evidence does not show that these triplicate copies were ever delivered, as agreed by the architects.

It is also shown that the bid of the Weir & Craig Manufacturing Company, for the machinery other than the refrigerating machine, was $17,405. The testimony is uncontradicted that, at the December consultation (ending in proposal and acceptance of plaintiff's Gubbins', bid), Lautenschlager proposed to give Gubbins $50 more than the Weir-Craig bid; and that, finally (after revision of the specifications by erasing some material and work, lowering quality and price as to others, and so lessening contract price), when plaintiff had sealed his bid down, Lautenschlager proposed dividing the dif-

ference between Gubbins' bid and the Weir-Craig bid, etc.; and that this "splitting the difference" resulted in the proposal from plaintiff which was accepted by defendants. Now, if this Florida machine is added at $7,500 to the Weir-Craig bid (increased by the $50 and the "splitting of the difference"), the result is the accepted proposal of $25,083. Both the architect Huehl and Lautenschlager testify that they then understood that a new machine would have cost $15,000 to $20,000. These facts are convincing that these two parties then understood the refrigerating machine plaintiff proposed to supply was not a new machine, and was to be put in at $7,500. There is also testimony strongly tending to show that the plaintiff, at the time of his proposal, refused to make the proposal to include the machine, unless Lautenschlager would agree to take Metzger for the refrigerating machinery, plaintiff stating that he knew nothing about such machinery or this machine, and would not bid on that. And that Lautenschlager agreed to do that, adding that he had made inquiries and knew of the machine himself. It is not necessary to decide as between the conflicting claims on this point, although the surrounding circumstances strongly corroborate the fact, as claimed by plaintiff.

Without further detailing the reason impelling to such conclusion, I am of the opinion, under all the evidence, that this pen-written addition to page 5 of specifications produced by plaintiff was made before the proposal and acceptance, and relates to, and is a part of, the contract between the parties.

The evidence shows that the plaintiff set up the machinery, etc., in the plant at Ft. Madison, and that on May 31, 1892, it was first started, with the refrigerating machinery, for slaughtering. On that day nearly 200 hogs were killed. The evidence is conflicting as to the operation of the machine on that day. The parties interested, together with the architect Huehl and others, looked over the plant before it started, and there seems to have been no dissatisfaction then expressed with its condition. After the plant was put in operation that day, and the slaughtering was in progress, it was found that the refrigerating machine was not properly cooling the chilling rooms. This caused a stopping of the work. For about a month thereafter, plaintiff and his men were at work on the machinery, attempting to remedy the defects, and to cause the refrigerating machine to do the work it was intended to perform. On July 2d the machine was not yet able properly to cool down the chilling rooms to the temperature required. Defendants and the architect (superintendent) Huehl demanded of plaintiff that he replace the refrigerating machine with a larger machine, one that would properly chill—cool down to the required temperature—the chilling rooms. Plaintiff refused, claiming that this machine was the one defendants had themselves selected to do the work. This demand being named by defendants as their ultimatum, plaintiff announced he would have nothing more to do with the plant, claimed he had fulfilled his contract, called off his men, and left the plant to defendants. Within a few days thereafter, the architects (who, by the contract of January 7th, were made the superintendents of the contract work) for-

mally notified plaintiff of what they claimed were defects in performance of plaintiff's contract, and demanded that these defects be remedied, and notified plaintiff that, in default of his immediately remedying the same, defendants would proceed, under contract and specifications, to remedy same, at plaintiff's expense. In consequence of plaintiff's failure to comply with these notices (one dated July 5, the other July 18, 1892), defendants put in the plant another and larger refrigerating machine, and also made other changes.

The first point to be here decided is whether, under the contract and the specifications, it is requisite to plaintiff's right to recover that he prove the acceptance or approval by the superintendents of the work done by him under his contract. As to this point the two sets of specifications presented are in accord. The contract of January 7th defines the duty of plaintiff as follows:

Plaintiff does hereby covenant and agree to furnish and perform in a complete manner, and in accordance with the specifications hereto attached and plans furnished, which plans and specifications must be understood as forming the main part of this agreement, and to the entire satisfaction of Huehl & Schmidt, superintendents in the premises, the entire, etc.

The specifications (as proposed and accepted upon December 12th, and made part of the contract of January 7th) provide as to this point:

Duties of Contractor. He shall be held strictly to execute such work and use such materials as hereinafter described, and he will be further *held* to submit as to the character of material used, and the work done, to the judgment of the superintendent, and to remove and replace, by other, any material that, in his judgment, is not in accordance with the specifications.

The specifications then proceed in general terms to provide for the right of the owners to remove and replace by proper material, etc., if contractor shall delay after three days' notice, in writing, to remove or replace same, etc., and that contractor shall be liable not only for difference in cost to owners thereby, but in resulting damages, etc.; also, that in case of additions or deductions as to work, if the superintendents and contractor cannot agree, they shall submit the same to a third party, to be named by them, and his decision shall be final.

Plaintiff claims that the evidence proves an oral acceptance of the contract work by the superintendent Huehl, at Ft. Madison, on May 31, 1892, the day of the slaughtering, as above stated; while defendants contend that the contract is complied with only when plaintiff has obtained a written acceptance or approval from the superintendents. Some testimony has been offered tending to show that the custom of architects, under like contracts, requires such written acceptance. In my judgment, no sufficient or proper basis is shown for holding a written acceptance necessary. Besides, the contract does not so state. Its phraseology is: "Agree to furnish and perform in a complete manner, and in accordance with the specifications, * * * to the entire satisfaction of the superintendents." The fact that notice (of defects, etc.) from superintendents to contractor must be in writing emphasizes the view that a written acceptance is unnecessary under the terms of this contract. I am unable to

find from the evidence that any oral acceptance by the superintendents is proven. On this point (as to oral acceptance by the superintendents) the evidence is in irreconcilable conflict. On plaintiff is the burden of its proof. This burden has not been sustained. For the month following this alleged acceptance, plaintiff had his men at work on the plant, attempting to remedy its manifest defects in working; and plaintiff himself visited the plant at different times during that month. If further proof is desired, it is found in the fact that when plaintiff, in July following, withdrew from further attempts at correcting the defects in the plant's working, no claim was then made by him that the superintendents had accepted the plant. His asserted justification for then leaving the plant was that he had fulfilled his contract, and the demands then made upon him were beyond and outside of the contract.

Defendants now claim that the acceptance by the superintendents of the work done and materials furnished—that is, approval thereof as a complete compliance with the terms of the contract—is a condition precedent to the right of the plaintiff to recover herein. In my judgment, it is not necessary to enter into a discussion of the legal propositions applicable where payment is by the contract made conditional on an express approval or acceptance by the superintendent. Much discussion has been had, and many decisions cited, on various phases of these propositions. After all, the final test is the contract of the parties; and, looking to the contract herein, I find no provisions requiring such express approval or acceptance by the superintendents, as condition precedent to payment. The specifications above quoted, as to duty of contractors, do not so provide. They do place the character of materials furnished and work done subject to the judgment of the superintendents, and provide for the removal of improper work and materials when duly directed by the superintendents; but they provide, in case of a failure to so remove, a penalty, in the nature of a deduction from the contract price and damages resulting from failure to remove, and also that the owners may, at the contractor's expense, make such removal, provide proper material, etc. And, as to the "extras," the specifications not only do not make the judgment of the superintendents necessary to the recovery thereof, but expressly provide for arbitration, if the superintendents and the contractor cannot agree. Turning to the contract of January 7th, wherein the terms of payment are stated, we find that it is expressly provided that the first and second payment shall have fallen due when the "machine, boilers, tanks, and pumps are delivered and put on foundations." As to the remaining payments it provides:

The third payment to be $5,000, and to be made as soon as all the parts of the work are delivered and put in place in complete and perfect manner. The fourth and final payment to be the balance of the contract price, and to be due in (60) sixty days from the time all work shall have been finished and completed, and shall be paid to [plaintiff] upon the express condition that he furnish to [defendants] a good and sufficient guaranty and bond to protect the [defendants] from any loss from defects in any part of the machinery, either in material or workmanship, and upon the express condition that the [plaintiff] show in a good and sufficient manner that there are no

claims for material or labor furnished, which claims may be a lien upon said buildings or premises.

It is pertinent to inquire why a "good and sufficient bond" was provided for, to protect against defects in machinery, etc., if the approval or acceptance by the superintendents was to be a condition precedent to the payment. This consideration is emphasized when it is noted that the contract nowhere declares such acceptance or approval to be required as a condition precedent to the demanding of any payment named. The insertion in that part of the contract relating to the agreement of the contractor that he shall complete the work to the "entire satisfaction of the superintendents" cannot be construed as barring plaintiff from the courts until that satisfaction has been expressly stated. Had such been the understanding of the parties at date of contract, it might and would have been so expressed in apt and easily phrased provisions. Citation of authority is unnecessary to the legal proposition that contracts are not liberally construed for the purpose of finding therein provisions debarring parties from access to the courts, for settlement of controversies; and, where there is not present some condition precedent to demand of payment, the question for the court to decide is, have the contract provisions been fulfilled? Since the specifications gave to the superintendents the duty of supervising the materials furnished and work done, and provided, under penalties to the contractors above suggested, for removal of any defective materials or work, as to which they had given written notice, we turn to the written notices (dated July 6 and July 18, 1892) herein introduced as served on plaintiff in this regard. I have not obtained from the mass of evidence introduced (nor has my attention been called to any defects claimed to exist) any points wherein plaintiff is asserted to have failed in performance of his contract, other than those contained in these two notices. The examination of these numerous items, named in these notices, must be a matter of detail. I will group them so far as appears practicable:

(1) By this item in notice of July 5th, which we will first consider, the steam engine, as originally placed in the plant, is not attacked.

The defect now claimed relates to its subsequent condition, that it "has been by you rendered useless since said engine was placed therein." The items constituting such worthless condition are not specified. Some testimony has been introduced to the effect that the engine was not in line with the main shaft, and that its foundation had been disturbed by its working. But Finch, an employé of defendants, who was working at the plant from June 1st, until after this notice was given, as chief engineer for defendants, and in charge of the whole plant, so far as defendants then had it in charge, when testifying on behalf of defendants, and asked to point out the defects in the plant in June, as compared with the requirements in the specifications, does not speak of any such condition of the engine at that time. G. W. La Moss, a machinist, who assisted Finch and Metzger in June to make repairs, enumerates defects about the plant, which he testifies were remedied before he left,

but does not include the defective condition of the engine, specified in this notice.

(2) "The refrigerating machine is incapable of reducing the temperature to 36 Fahrenheit, or chilling 800 hogs, of the average weight of 200 pounds, or 200 beeves, of the average weight of 600 pounds, every 24 hours, and is utterly worthless for use in said packing house."

The question at once arises as to the contract requirement with reference to the refrigerating machine. To some extent I have already considered this question, and found that the parties intended to, and did, contract for the fitting up and placing in this plant of the Tampa (No. 4 double Linde) machine. We may not pass over the fact that in neither of the notices is it claimed that this machine was not of the capacity described in the specifications:

Capable of receiving, compressing, and discharging two hundred thousand cubic inches of ammonia gas, at a tension of five pounds per square inch, at normal speed.

The defect complained of is not to the working capacity of the machine, but as to the effect it produced in the chilling rooms. Much testimony has been submitted regarding the presence, in the specifications, of the provision, under head of "Brine Piping" (page 5, specification):

Is to be 6″ diameter spiral riveted of No. 18 gauge galvanized iron, and suspended to ceiling of storage room, with neat wrought-iron hangers, and of sufficient quantity to produce and maintain temperature of 36 Fahr., with the work of taking care of meat going on in the rooms. The maximum number of hogs to be chilled is 800, of average weight of 200 lbs., and 200 beeves, of average weight of 600 lbs., per 24 hours.

Then follows the pen and ink writing as to the machine being the Tampa machine, etc., as hereinbefore copied.

An inspection of these specifications will show that they are subdivided, viz.: "Refrigerating Machine"; "Condenser"; "Brine Piping," etc. These quoted provisions as to the maximum of 800 hogs and 200 beeves occur under "Brine Piping." The uncontradicted testimony is that the Tampa machine could not, under the most favorable circumstances, be relied on to chill such a number of animals per day. The testimony is convincing that the chilling rooms at this plant were unquestionably not equal to the task of caring for that number daily, but that their maximum capacity for daily running would be about one-fourth that number of hogs, and a third such number of beeves. The fact that the building's capacity was thus limited, while this clause in the specifications calls for so vastly greater chilling capacity, tends strongly to corroborate Metzger's testimony that this clause was added for the purpose of inducing high bids from others. Perhaps its addition was also from a desire to thus make the specifications more nearly approach what the Ft. Madison people were expecting the capacity of the plant would be, according to their contract with the packing house people. Testimony was introduced showing that both the architect Huehl and Lautenschlager were informed while receiving bids, and before the contract with plaintiff was made, that the rooms—chilling rooms in the plant,

of the packing house—would permit a daily slaughtering of only a small part of the maximum number stated in this brine piping portion of the specifications.

No injustice is done to any of the parties herein by assuming that all such parties, at the time the proposal was made by plaintiff, and accepted, supposed that a refrigerating machine capable of "receiving, compressing, and discharging" ammonia gas at the rate above specified would be capable of producing and maintaining the low temperature stated; otherwise, these two inconsistent tests would not have both been given, if all were acting in good faith. The evidence shows a wonderful lack of information even, not to say knowledge, among these parties, as to the requirements and capabilities and working of a refrigerating machine. Gubbins says that he informed defendants that he knew nothing about such a machine, and that he would not bid unless they would take Metzger for that machine. Each of the defendants testify to their own ignorance in the matter. But by far the most profoundly ignorant in this direction was the architect, Huehl, who testifies that he drew up the specifications, and was therein constituted the judge of the work performed and the materials furnished for such plant. The evidence justifies the conclusion, under all the facts proven, that, at the time these specifications were made the basis of the acceptance and proposal of December 12th and the contract of January 7th, none of the parties expected or understood that plaintiff was proposing or contracting to erect a machine of the actual chilling capacity as to number of hogs and beeves as named therein; and when it is remembered that the daily slaughtering capacity of the plant,—as to chilling rooms,—as the same were planned by this very architect, and as actually erected, is not one-third of the number of animals named in said clause, this conclusion becomes irresistible.

The one point remains as to the ability of the machine to produce and maintain a temperature of 36 Fahrenheit in the chilling rooms. No complaint is made but that the amount of piping called for by the specifications was actually placed in the rooms. A number of witnesses testify that the quantity thus placed in the rooms was far in excess of what would produce the best chilling effect, with the Tampa machine; that by reason of the large extent of piping, the machine was rendered unable to do the full work it might otherwise have done. Again, there is much evidence submitted as to imperfect insulation of the chilling rooms, complaint thereof to defendants by plaintiff and his workmen, and failure to remedy it. The testimony is in strong conflict. It is conceded that the floors were in very bad condition, and leaked brine; whereas they should have been brine tight. The disinterested experts, by their testimony as to the usual, proper, and necessary method of building and insulating such rooms, strongly condemn the chilling rooms furnished by defendants at this plant. Plaintiff had a right to insist, as he seems strongly to have insisted, that he have these chilling rooms well and properly insulated; and the evidence convinces me that he was not furnished with them, and that, when complaint was made and demand for proper insulation of them, de-

fendants failed to furnish such insulation. One further suggestion is proper. It will be noticed that the requirement as to producing and maintaining a temperature of 36 Fahrenheit relates, according to the phraseology of the specifications, not to the refrigerating machine, but to the piping itself. This piping is to be of sufficient quantity to produce and maintain a temperature of 36 Fahrenheit. The evidence would justify the conclusion that there was sufficient quantity of brine piping supplied by plaintiff to produce and maintain the temperature named had the chilling rooms been properly insulated, and the refrigerating machine of capacity corresponding to the extent of the piping. As the refrigerating machine was the one specially contracted for, that it did not thoroughly chill the entire body of piping will not defeat plaintiff's recovery, if otherwise entitled. What might have been the result with the rooms properly insulated is now a matter of mere speculation. Had defendants attended to such insulation, and made the floors brine tight, experience would have taken the place, in this particular, of speculation. It is insisted, however, that the new refrigerating machine did thus produce and maintain the specified temperature. In answer to this, it is convincingly urged that the new machine was 100 ton refrigerating, instead of 25 to 30 ton refrigerating (as was the Tampa machine), and that the new machine worked by a different system of refrigeration.

(3) "Expansion pipes, to extent of over half, are worthless and dangerous, not fit for use, liable to cause damage, their construction in direct violation of the contract."

Such a notice does not comply with the specifications. No particulars are noted as defective, so that plaintiff could repair or remedy them; nothing specified; merely "worthless," "dangerous," etc., and this "to extent of over one-half," and that half not designated. I must decline to regard this as a proper notice. There is evidence, however, that the pipes were properly constructed, but damaged by defendants' workmen in walking upon them.

(4) "Two of the pumps cannot be operated, and are worthless."

Again, this same lack of specification or designation makes this claim of defect unavailable. The testimony of La Moss, Finch, and Metzger do not sustain this allegation of defect.

Passing now to notice of July 18th:

(5) "Heater is a secondhand heater, of 80 horse power, instead of 160 horse power."

In plaintiff's specification, with reference to the heater, there is added (written with pen and ink) "coming with ice machine." If this is accepted as part of the specifications, then, under the evidence, defendants could only require plaintiff to fit up and properly place the heater; for, as part of the refrigerating machine, the heater, as the rest of the machine, was really bought by defendants, plaintiff, at their request, advancing the money, and receiving as his compensation the $500 for the work by him performed and furnished in fitting it up. There does not appear, under the evidence, any special complaint as to this heater prior to July 18th, some weeks after plaintiff had terminated his connection with the plant. No

evidence is submitted as to the damage because of its smaller capacity. I would not be able to determine, therefore, if plaintiff were held liable, what damages to award. But, taking the evidence as a whole, I do not find that plaintiff is responsible to defendants for this lessened capacity, as claimed, of heater. The capacity of this heater must have been known to the architect, Huehl, notwithstanding the gross ignorance he confesses as to these matters, wherein, as superintendent, he should have made himself well informed. He makes no complaint until July 18th. I am confirmed in finding (from the other evidence) that neither superintendent nor either defendant intended or expected to hold plaintiff responsible for the heater's capacity. Plaintiff is not responsible for its capacity as a part of the refrigerating machine.

(6) "Belting of rubber, and not of oak-tanned. No Barthol grease cups on hanger. Two hog washers are 1″, should be 1½″. Exhaust pipe has no maypole."

As to these four claims of defect, I find from the evidence that the portions of the specifications relating to them were so changed from typewritten copy at the December 12th consultation, and before the proposal was made and accepted, as that present condition, in respect stated of these claims, is in accordance with the specifications.

(7) "No stop valve on each section of condenser. No by-pass arrangement in connection with expansion pipes, permitting cutting off of part of system. Pipe from feed pump is 1½″; should be 2″. Pipe to heater is 1½″; should be 2″. Pipe, heater to boiler, is 1½″; should be 2″. Pipe, heater to chamber of house and fire pump, is 4″, instead of 5″. No hose valves on stand pipes. Pipe through tank room is 2″; should be 2½″. Pipe, header to engine, 3½″; should be 5″. Pipe (1″), header to boiler, not furnished. Pipe, house supply, is 3″; should be 6″. Plugged opening in header, only one; should be two. Pipes through floors, no thimbles or gaskets furnished."

In each of these points the claims appear to be what the contract requires, but whether the defect claimed existed, and, if so, the damage therefrom, I am not able to determine from the evidence.

(8) "Ammonia pipe put together with common steam couplings. Suction pipe is 4″; should be 6″. Liquid and gas pipes put together with common steam connections. Only 24 stop valves on condenser; should be 36."

I am not able to locate these requirements in the specifications, nor determine by the evidence if defects existed as claimed.

(9) "Pumps are in imperfect condition, and cannot be used. Grate bars of the boilers not properly set, and cannot be operated. Many of the expansion valves are leaking. The valves are in most part of cheapest make, do not work properly, not of approved make. Besides the above, there are many minor defects in the machinery, which will have to be made right before the same can be of any use to Huttenlocher and Lautenschlager, and permit them to conduct their business without danger of loss to them, or of injury to the workmen employed by them."

As to the pumps, the testimony tends to show that they were cut out by sand in pumping water out of a well, by direction of defendants, as the well was being dug for the plant. But of that, as well as of the other matters under this division (9), the claim is so general—so lacking in claim for specific defects—as to make the same unavailable herein. I cannot locate these alleged defects under the evidence submitted.

I have now enumerated and considered each claim contained in these two notices, and they are all the notices served on plaintiff as claims of defects in work or material. The engineer Finch, an employé of defendants, and who was working at the plant in the months of June and July, when asked to point out from the specifications before him, the defects or matters wherein the work or materials failed of fulfilling the specifications in defendants' set, enumerates the following: The pipes, expansion pipes (page 4, specifications), were not lap weld, and did not weigh three pounds per foot. There was not a stop valve in each section. All of the ammonia pipes were not extra heavy. There were cast-iron elbows used, where it was possible to make a bend. There was no by-pass arrangement from ammonia pumps to exhaust any one part of the system. The valves, or most of the valves, were all leaking badly. They never produced a temperature of 36 Fahrenheit in beef house or hog house. There was not 160 H. P. brass tube feed-water boiler. The coupling bolts were not turned and fitted to holes in couplings. Not any oak-tanned leather belting except two (four-inch belts), used on elevator. Hog elevator would not hold six hogs at one time; not in working condition. No covering of any kind on steam or hot water pipes. "Now, are these defects which you have mentioned, those which you are able to remember after a lapse of two years? They are." Architect (Superintendent) Huehl (pages 12, 13), having testified as to parts of the Gubbins machinery being left in the plant when the new refrigerating machinery was put in says: "At that time they [these parts of the Gubbins plant which were so left] seemed to be in proper condition. The trouble was then particularly about the refrigerating machine." This testimony agrees with that of all the witnesses as to the conversation which occurred just preceding plaintiff's quitting the plant, and terminating his connection with it; that the trouble was particularly about the refrigerating machine. Its failure to reduce the temperature of the chilling rooms to 36 Fahrenheit was the subject of defendants' ultimatum to plaintiff as then announced.

Plaintiff claims $1,909.07 as "extras," or work additional to that named in the contract, by him done about the plant, and at defendants' request. Included therein appears: "Railroad fare and expenses, $38.69." No evidence is presented of any promise or agreement of defendants to pay this item, nor is it shown that they are properly chargeable therewith. The further item is included: "Metzger, time on ice machine at shop, 370 hours, at .60, $222.00." Plaintiff's proposal, as accepted, included $500 for work fitting up the Florida ice machine. There is no basis shown for this item as an "extra" chargeable against defendants. The further items:

"Burke, fixing boiler from May 15 to July 2, $101.45; Metzger, as engineer, 360 hours, $180.00,"—are not chargeable as extras. I have found that plaintiff's work was not accepted by the superintendent on May 31st. Defects that day appeared, which plaintiff attempted in vain to correct, the work extending into July. Whether plaintiff had or had not so performed his contract as that, on May 31st, he might have refused to do further work, insisted on his contract having been fulfilled, and demanded payment, and then withdrawn from further connection with work, it is certain that he did not so act. He kept some of his men at work on the plant, attempting to remedy alleged defects, during the whole month of June. On July 2d he withdrew from the work, and left the plant to defendants. Up to that time, the evidence is that plaintiff was in practical control of the machinery work of the plant. And, while so in control, he could not, unless by express agreement, make defendants chargeable with the time of those men, excepting, however, what these men did on machinery or work which, by the specifications and contract, plaintiff was not required to do. But such last-named work stands as an "extra," the same as material on which that work was expended. The further charge, "1,210 lbs. ammonia, $435.-60," occupies a somewhat peculiar position. The refrigerating machinery had not yet been turned over to defendants. Plaintiff's men were engaged in perfecting it. Had plaintiff, on May 31st, turned such machinery over to defendants, he might, according to my view of the evidence, have successfully claimed his contract price (possibly with some few minor deductions). But he did not do so. He did not withdraw from control of it until July 2d. Meanwhile plaintiff was attempting to remedy defects in such machinery. In my judgment, he cannot collect from defendants amounts paid for ammonia (used in such attempts) prior to July 2d. Under the evidence, the remaining "extras" ($931.33) should be allowed to plaintiff, in arriving at his side of the controversy.

Defendants present, in their cross bill herein, several claims as to which they demand judgment against plaintiff. As to the amount of money paid by defendants to plaintiff which should be applied as payments on plaintiff's contract, there is little dispute. To plaintiff, and his men for him, defendants paid, in cash, $10,175; for freight, $282.61; for brick, $103.40; for ammonia, $251.17; for oil, $36.20; for fuel, $153.82; for boards for scaffolding, $75,—a total of $11,-077.20. This amount should be charged to plaintiff, and credited to defendant. The amount claimed by defendants as paid for new refrigerating machine and attachments, I find, ought not to be charged against plaintiff. Plaintiff fitted up and put in place the very machine which defendants and he intended and understood by the terms of the specifications and contract he was so to fit up and place in the plant. For defects in the machine and its workings (not caused by failure of the work or defects in the work put or to be put thereon by plaintiff), plaintiff is not responsible to defendants in this action. This view of the matter also disposes of claims of defendants for the expenditure by defendants for the changes in making the plant ready for the new machine, new arrangements for

pipes, heaters, and other work necessary to be done in adapting the plant to the larger machine and its different system of refrigeration.

Defendants, in cross bill, claim damages from plaintiff (1) for wages paid workmen, employed to work in this slaughtering and packing plant; (2) expenses and losses in keeping, feeding, and selling stock which defendants purchased, and retained, to be slaughtered in said plant; and (3) loss of profits on said plant from May 1 to September 15, 1892. The basis of these claims is that plaintiff, Gubbins, by his contract with defendants, was to have the plant ready for operation by May 1, 1892; and that plaintiff afterwards "directed and authorized" defendants to prepare for commencing the operation of said plant at said date, which plaintiff knew would compel defendants to employ many hands, and purchase a large amount of material, etc. The pleadings expressly state these claims are based on the element of time as of the essence of the contract. I do not find in the specifications, proposal, and acceptance, of December 12th, nor in the contract of January 7th, any provision making time of the essence of the contract. Nor is there proven that plaintiff agreed or bound himself to have the plant in operation by the 1st day of May, 1892, or at any time during that month. Huehl, the architect, and Lautenschlager, both testify that the omission of the date of completion from the specifications was intentional. Lautenschlager says that, after the contract was made, he and Gubbins frequently talked it over as to getting the work done by May 1st, and Gubbins promised faithfully that he would do his level best to have it done (page 771). I am not able to find in the evidence such a basis of representation or inducement by plaintiff to defendants to employ, on strength thereof, force, and purchase stock, for commencing the operation of the plant in May, as to justify holding plaintiff liable for the loss to defendants, because men were idle and stock were on expense during May and June. The evidence also shows that plaintiff's work at the plant was retarded by delayed condition of the carpenter work; that this work was not completed until in May. Huehl says that the carpenter work "was finished in the latter part of April, or early part of May, practically finished"; and the plaintiff's workmen state a number of parts of the work, some of it for over two weeks, were delayed because the machinists had thus to wait upon the carpenters. I must therefore disallow all claims of defendants which are based on alleged duty and contract of plaintiff to have the plant in operation by May 1st, and also disallow all claims presented by defendants for wages and expenses of men, and expenses of keeping stock, and loss of profits of plant, between May 1 and September 15, 1892, on the ground that no liability therefor has been proven against plaintiff.

Counsel for plaintiff insist that if damages might be allowed against plaintiff for losses, etc., by reason of failure to have plant earlier or more perfectly in operation, defendants, A. C. Lautenschlager and William Huttenlocher, cannot recover under pleadings herein, from the proven fact that A. C. Lautenschlager & Co. were the owners of the stock, and made the payments to the men now sought to be recovered back from plaintiff; and no assignment or

transfer to defendants. Huttenlocher and Lautenschlager, of the right to damages (if right existed to A. C. Lautenschlager & Co.) has been shown. The evidence strongly supports this proposition; but, in the view taken of the case, this point is immaterial.

The petition in this suit was originally filed on the law·side of the docket. This error in the clerk's office was afterwards, on motion of plaintiff, corrected, but not without resistance on part of defendants. The order of transfer to the equity docket states:

If it should appear that any issue in the case is properly referable as an issue at law to a jury, the court will hereafter make such proper order as the record shall present.

The suit was afterwards fully prepared for trial as in equity, and heard as such. In brief of counsel for defendants it is said:

We must respectfully ask for a judgment dismissing plaintiff's bill on the merits, adjudging plaintiff is not entitled to recover any sum whatever, canceling his alleged lien; and, in addition thereto, we ask a judgment against him for the net amount of $12,918.78, clearly shown to be due over and above the prices contracted to be paid, and in which computation we have omitted all the incidentals and casual losses, amounting to thousands of dollars more.

In view of the present status of the case, I find nothing presented by the record which is properly referable to a jury herein.

I find plaintiff entitled to the amount of his contract bid, $25,-083.50; and extras to the amount of $931.33,—total, $26,014.83. From this deduct payment and materials purchased by defendants, as hereinbefore found, $11,077.20; leaving due plaintiff, August 10, 1892, from defendants, $14,937.63.

It is insisted in argument by counsel for defendants that plaintiff is not entitled to the final payment herein, because (1) he has not "shown in a good and sufficient manner that there are no claims for materials or labor furnished, which claim may be a lien upon the buildings or premises," etc.; (2) he has not furnished "a good and sufficient guaranty and bond to protect defendants from any loss from defects in any part of the machinery." There will be no question but that defendants may, if they desire, waive the two provisions just named. They were inserted in the January 7th contract for protection to defendants. If defendants did not desire to insist on these provisions, no one else could insist on them. We look in vain in the different pleadings herein filed by defendants for any insistence on these two points. In the answer filed January 7, 1893, to the original bill, as well as in the answer January 30, 1894, to the bill as amended, no insistence is made on either of the two points named, but the defense interposed is stated with extended and amplified detail on other and different points. The court is justified in holding that defendants have waived the observance of these two contract conditions. Especially may it be so held since, looking at the contract and the surroundings of these conditions, the conditions were manifestly intended for the protection of the defendants upon their making amicable and voluntary payments, and were not intended to apply to the payments under decree of a court wherein the case has been fully heard, and wherein all the elements to which these two points referred might be fully examined and settled between the parties.

I find, then, as due plaintiff from defendants, on August 10, 1892 (date of filing of bill herein), $14,937.63, to which, with interest thereon from that date at 6 per cent. per annum, and costs herein, plaintiff is entitled to judgment. I further find that he is entitled to decree of foreclosure and sale, under mechanic's lien exhibited with bill, of the premises therein described, to discharge said judgment, with costs and accruing costs; and that the cross bill filed by defendants be dismissed. Counsel for plaintiff will prepare and submit to counsel for defendants draft of decree accordingly. To all of which plaintiff and defendants severally except, and 90 days are given from this date for preparing, having signed, and filed herein, such bills, certificates, and other papers as counsel may be advised are desired to be filed herein, in preparing this suit for appellate consideration.